THOMPSON, Judge.
B.L.S. (the “mother”) and R.T.S. (the “father”) were married for approximately 17 years. On June 17,1998, the trial court entered a judgment of divorce that divided the parties’ marital property and awarded custody of the parties’ four children to the father. Both parties filed postjudgment motions. The trial court denied those motions. The mother appealed.
On appeal, the mother argues that the trial court erred in awarding custody of the parties’ four children to the father. She argues that the trial court erred in denying her custody of the children because of her affairs after the parties had separated and the husband had sued for a divorce; she argues that there was no evidence indicating that her conduct had had a detrimental effect on the children.
Much of the trial testimony focused on the father’s allegations that the mother had committed adultery. The mother denied many of the details of the father’s allegations, but admitted that she had had a brief affair in the fall of 1997 after the father had filed for a divorce. Later, in January 1998, the mother visited friends and family in New Jersey. She admitted at trial that in April 1998 she began a relationship with a family friend from New Jersey. The father presented no evidence to demonstrate that the mother’s affairs had had an adverse effect on the parties’ children.
The father asserted that he had done the majority of the housework and was the children’s primary caregiver during the parties’ marriage. The mother denied that assertion and testified that she was the children’s primary caregiver during the marriage. She testified that she had stayed home with the children and did not seek employment until the father filed the complaint for a divorce. The testimony of two of the children’s teachers, a principal, the parties’ marriage counselor, one of the children’s therapists, and the mother’s fa *472 ther supported the mother’s testimony that she was the children’s primary caregiver. Those witnesses established that the mother maintained frequent contact with the children’s teachers, actively participated in assisting the teachers to meet the children’s educational needs, and took the children to their appointments with doctors and counselors.
The parties’ children range in age from 4 to 14. The parties’ 10-year-old son, C.S., was diagnosed at age six with Attention Deficit Hyperactivity Disorder (“ADHD”) and with epilepsy. He takes medications for both conditions. C.S.’s teacher testified that she talked with the mother frequently about C.S.’s progress and that the mother took a very active role in C.S.’s education. The teacher testified that she had never talked to the father and that he had never participated in PTA activities or in C.S.’s education plans.
The mother testified that although she had asked the father to read a book about dealing with children with ADHD, when C.S. was first diagnosed with that condition, the father did not do so until about a year and a half before the trial. The mother testified that the father’s relationship with C.S. improved after the father read the book.
T.S., the parties’ 13-year-old son, has been diagnosed with, and is taking medication for, a bipolar disorder and epilepsy. During the 1996-97 school year, T.S. was unable, because of his bipolar disorder, to attend school. A teacher with a “home-bound” education program visited the family’s home daily to tutor him. T.S. returned to school for the 1997-98 school year. The principal at T.S.’s school testified that the mother was one of few parents who, after learning that two of her children had “handicapping conditions,” educated herself on the law so that she could request or demand all available educational services for her children.
The mother testified that she has met numerous times with C.S. and T.S.’s teachers to help formulate the children’s individual education plans. During the time she was employed, the mother took time off from work to attend these meetings. The father admitted that he had attended only one meeting with one of T.S.’s teachers regarding the education plans; he had never met C.S.’s teacher.
The mother’s father testified that the father told him that it was not important that T.S. and C.S. take all of their prescribed medications, and that the father thought T.S.’s therapists did not know what they were doing and that T.S. would grow out of his bipolar disorder. The father testified at trial that he disagreed with the psychological treatment T.S. and C.S. received but denied saying that he thought T.S. would grow out of his bipolar disorder. He testified that he hoped T.S. would grow out of it.
In October 1997, the mother took T.S., who was 12 years old at the time, to his counselor and a psychiatrist because T.S. was having a depressive episode. T.S. reported to the counselor that the father had told him that he would have to testify in the pending divorce action and that T.S. would have to choose the parent with whom he was going to live. The counselor testified that T.S. did not want to testify or to choose between his parents and that the conversation with his father had frightened him. The counselor testified that as a result, she and the psychiatrist hospitalized T.S. immediately. T.S. remained hospitalized for approximately two weeks.
Phillip Hess testified that he began counseling the parties after the breakdown of the marriage; he testified that the focus of the counseling was not on saving the parties’ marriage but was on improving their communication for the sake of the children and enabling the parties to work together in dealing with T.S.’s illness. The counselor testified that the mother would follow the recommendations of T.S.’s doctors regarding techniques for dealing appropriately .with T.S.’s behaviors, but that the mother felt that in front of the child *473 the father discounted her efforts. Hess testified that T.S. reported to him that the mother would use the behavioral controls recommended by his doctors but that the father would tell T.S. that T.S. did not “have to go along with that. That that was not what he had to do.” Hess testified that the father questioned the amount of medication the doctors prescribed for T.S. Hess also said that the father “just kind of assumed that he knew what was best and that it did not matter if that did not coincide with what the professionals involved in T.S.’s treatment thought about it.”
Hess also testified that during the counseling sessions the father tended to focus on the parties’ marriage issues rather than on the issues relating to the children. Hess’s treatment notes indicate that the father was quick to criticize or blame the mother and that he was often “in [an] attack mode with her.” For example, the father told the mother and the parties’ counselors that the mother was mentally ill. Hess’s notes also reflect that the father accepted no responsibility for his own behavior and his contribution to the breakdown of the marriage; Hess’s notes indicate that the father quickly became defensive if the counselor focused on his behavior.
The father is employed as a plumber. The mother stayed at home and managed the household during the parties’ marriage, but she obtained a job shortly after the father filed his complaint for a divorce. The mother alleged that she was forced to obtain employment because, after filing the complaint for a divorce, the father refused to pay any of her expenses. Both parties continued to reside in the marital residence during most of the time the divorce proceedings were pending in the trial court.
The record contains a letter written by T.S.’s doctor noting that the impending divorce and the father’s telling T.S. that he would have to choose between his parents had created “undue stress on this child who already has a mental illness.” In the letter, the doctor recommended that it would be in T.S.’s best interests for the father to move out of the marital residence during the pendency of the divorce. The father refused to move out of the marital residence. At some point during the pen-dency of the divorce proceedings, the mother moved out of the marital residence and moved in with her parents, who live in the same city as the parties. The parties’ children remained in the marital residence with the father.
The mother began seeing a counselor before the parties separated. The mother’s counselor testified, and her treatment notes submitted as an exhibit reflect, that the counselor diagnosed the mother with an adjustment disorder with a depressive mood; the mother began taking antidepressant medication. The mother’s counselor testified that the mother’s condition was related to her unhappiness in the parties’ marriage. The counselor testified that immediately after the mother moved out of the marital residence and in with her parents, her condition improved and she no longer needed the antidepressant medication
The mother testified that, after the trial, she planned to move back to New Jersey to be near her three sisters. She testified that she had started investigating the special-education programs available in the schools in the area to which she planned to move.
It is well settled that where the trial court receives ore tenus evidence in a divorce proceeding, its custody determination based on that evidence will be presumed correct and will not be reversed on appeal absent a finding that the custody award was plainly wrong. Tribble v. Washington, 675 So.2d 468 (Ala.Civ.App.1996). It is equally well settled that in an initial custody determination, the parties stand on equal footing and no presumption inures in favor of either party. Smith v. Smith, 727 So.2d 113 (Ala.Civ.App.1998); *474 Graham v. Graham, 640 So.2d 963 (Ala.Civ.App.1994); Santmier v. Santmier, 494 So.2d 95 (Ala.Civ.App.1986). The standard to be applied in an initial custody determination is the “best-interests-of-the-child” standard. Ex parte Couch, 521 So.2d 987 (Ala.1988); Whitt v. Peoples, 655 So.2d 1048 (Ala.Civ.App.1995). In making its custody determination, the trial court considers a number of factors, including the ages and sex of the children and each parent’s ability to provide for the children’s emotional, social, moral, material, and educational needs. Parker v. Parker, 628 So.2d 800 (Ala.Civ.App.1993). We note that the mother is correct in her argument that in order to deprive her of custody, her acts of adultery must have had a direct bearing on the welfare of the children. Hearold v. Hearold, 620 So.2d 48 (Ala.Civ.App.1993).
The ore tenus presumption has not overcome this court’s reservations about the correctness of the trial court’s custody determination. Neither party’s conduct leading up to the divorce has been exemplary; nevertheless, it is clear that both parents love the children. However, the most significant factor in the custody determination in this case must be the needs of the children, particularly the specialized needs of T.S. and C.S. The record clearly indicates that the mother has had the overwhelming majority of the responsibility of ensuring that the children’s psychological and educational needs were evaluated and met. The father has not been cooperative or supportive of the mother’s efforts to comply with the recommendations of the children’s doctors. T.S.’s counselor testified that, after dealing with both parties in counseling sessions, he felt that the mother would be more likely to ensure that T.S. received long-term treatment for his condition.
The foremost consideration in a custody determination is the best interests and welfare of the child or children. Graham v. Graham, supra; Parker v. Parker, supra. We must hold that, under the facts of this case, the trial court erred in awarding custody of the children to the father. We conclude that it is clearly in the best interests of the children, especially C.S. and T.S., to be in the custody of the mother. We reverse the trial court’s judgment as it relates to child custody.
The mother next argues that the trial court erred in refusing to allow her to present evidence in support of her post-judgment motions. However, the record does not contain the transcript of the hearing on those motions. Therefore, this court is unable to determine what, if any, error occurred. Any error of the trial court must be affirmatively demonstrated in the record on appeal. Elliott v. Bud’s Truck & Auto Repair, 656 So.2d 837 (Ala.Civ.App.1995). The mother has presented no reversible error as to this issue.
The mother also argues that the trial court erred in awarding her an attorney fee of $1,000; she argues that the award of an attorney fee should have been greater. However, the award of an attorney fee is within the sound discretion of the trial court. Sullivan v. Sullivan, 631 So.2d 1028 (Ala.Civ.App.1993). It is also within the trial court’s discretion to set the amount of a reasonable attorney fee. Boykin v. Boykin, 628 So.2d 949 (Ala.Civ.App.1993). We cannot say that the trial court erred in its award of an attorney fee; that award is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
CRAWLEY, J., concurs in part and dissents in part.